# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ALETA BALLARD, :

                Plaintiff,

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                Defendant. :

Case No. 3:08-cv-019

District Judge Walter Herbert Rice
Chief Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g), as incorporated into 42 U.S.C. §1383(c)(3), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for supplemental security income SSI benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits

2

prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 . If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSI on April 22, 2004, alleging disability since November 11, 2002, due to chronic back pain, carpal tunnel, slow learner, and a hearing impairment. (Tr. 58-61; 66). Plaintiff's application was denied initially and on reconsideration. (Tr. 39-42; 45-47). A hearing was held before Administrative Law Judge Thaddeus Armstead, (Tr. 411-46), who determined that Plaintiff is not disabled. (Tr. 15-29). The Appeals Council denied Plaintiff's request for review, (Tr. 6-8), and Judge Armstead's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Armstead found that Plaintiff has severe vertebrogenic disorder, a lumbar sprain/strain, borderline intellectual functioning, and reduced hearing mitigated by use of a hearing aid, (Tr . 20, ¶ 2), but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 23 ¶ 3). Judge Armstead found further that Plaintiff has the residual functional capacity to perform a reduced range of light work. (Tr. 25, ¶ 4). Judge Armstead then used section 204.00 of the Grid as a framework for deciding, coupled with a vocational expert's testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 29). Judge Armstead concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. *Id.*

A review of plaintiff's high school records show that on May 3, 1969, when she was 16 years old, Plaintiff underwent a psychological evaluation. (Tr. 404). Plaintiff had an IQ of 65 on the Stanford-Binet Intelligence Scale. *Id.* The school psychologist noted, "[a]s the school knows, she is NOT too bright, even though she's well compensated in some areas." *Id.* The psychologist further noted that Plaintiff had difficulty following instructions, that she needed instructions to be as specific, concrete, and as personally relevant as possible, and that her academic work must be "straight forward and at a relatively low level." *Id.*

Plaintiff originally injured her back on November 22, 1996, while helping a friend clean. (Tr. 206). On December 10, 1996, Plaintiff underwent an EMG, which identified radiculopathy at the left L4-5 level. (Tr. 140). An MRI of her lumbar spine performed on December 12, 1996, demonstrated a disc herniation at the L4-5 level and this pathology was again demonstrated on an MRI performed on December 18, 1998. (Tr. 145-46). In January, 1999, Plaintiff underwent an excision of an extravasated nucleus pulposus, L4-5 on the left which Dr.

4

Serif, an orthopedic surgeon, performed. (Tr. 209-10).

On November 11, 2002, Plaintiff sustained a subsequent injury to the low back when she slipped on a waxed floor, which caused her to unexpectedly twist, but not fall. (Tr. 174-175). Treating physician Dr. Peters of the Mercy Occupational Health Center identified Plaintiff's diagnosis as lumbar strain. *Id*. On November 27, 2002, Dr. Peters noted that Plaintiff was still experiencing pain in her low back that radiated down her lower extremity, that her gait was markedly antalgic, and that in a seated position she preferred to keep her right leg extended at the knee to relieve the pressure on her back. (Tr. 171).

An MRI of Plaintiff's lumbar spine performed on December 16, 2002, demonstrated findings consistent with the previous laminectomy at the L4-5 level, a focal small central disc protrusion at L3-4, and degenerative disc at L4-5 with a loss of disc height. (Tr. 166-68).

On April 30, 2003, Plaintiff sought emergency room treatment for back pain. (Tr. 147-49). It was noted that Plaintiff had some tenderness to palpation in the lower lumbar region and the right paraspinal musculature. *Id.* Plaintiff's diagnosis was identified as an acute exacerbation of sciatica and she was treated and discharged. *Id.*

Dr. Serif reported on May 6, 2003, that Plaintiff had tenderness in the right paravertebral muscles, limited range of motion, and positive straight leg raising test on the right. (Tr. 196-197). Dr. Serif also reported that Plaintiff had decreased sensation over the lateral aspect of the right thigh and mild weakness of the extensor hallucis bilaterally. *Id.* Dr. Serif noted that his impressions were degenerative disc disease, L4-5, status post lumbar laminectomy in that region and bulging disc, L3-4. *Id.* Dr Serif recommended that Plaintiff undergo evaluation by a spine surgeon. *Id.*

Examining physician, Dr. Kaplan reported on June 27, 2003, that Plaintiff had reached maximum medical improvement regarding her Worker's Compensation claim for the approved condition of lumbosacral sprain. (Tr. 150-53). Dr. Kaplan also reported that Plaintiff had a bilateral pseudo-antalgic gait which varied in character when she was observed formally versus informally, had pronounced grimacing with very superficial palpation of the thoracic or lumbar spine or even to simulated palpation in those areas, and that lumbar range of motion produced grimacing and rigid limitation range of motion at 5 degrees flexion or 5 degrees extension. *Id.* Dr. Kaplan noted that Plaintiff declined to walk on her heels and toes, there was grimacing while touching her ankle without the straight leg raising actually being attempted, and there was no atrophy or palpable spasm. *Id.* Dr. Kaplan opined that Plaintiff had recovered and had no restrictions or limitations whatsoever and did not require any work modifications. *Id.*

On July 1, 2003, Plaintiff consulted with neurosurgeon Dr. Cole who reported that Plaintiff had tenderness to palpation in the posterior lumbar spine, a decreased range of motion, a positive lumbar spine nerve root provocation, normal motor examination, and abnormal sensation in the right L5 root distribution. (Tr. 190-192). Dr. Cole also reported that Plaintiff's gait was narrow-based, that toe, heel, and tandem walking were normal, and that Plaintiff was able to arise from a sitting position without difficulty. *Id.* Dr. Cole noted that the lumbar spine MRI revealed herniated discs at L2-3 and L3-4 which were small and without significant neurologic compression. *Id.* Dr. Cole recommended lumbar epidural steroid injections. *Id.*

Plaintiff subsequently underwent a series of lumbar epidural steroid injections which Dr. Pavlatos performed. (Tr. 177).

On February 4, 2004, Dr. Moshos of the Mercy Occupational Health Center reported

that Plaintiff walked with a limping gait, that she was unwilling to participate in a work conditioning program, and that she was able to resume routine duties of her employment without restriction. (Tr. 155). Dr. Moshos discharged Plaintiff and instructed her to follow up with her primary care physician for treatment of chronic discomfort and that she could return to the health clinic only if willing to comply with treatment. *Id.*

Dr. Cole reported on March 2, 2004, that Plaintiff had tenderness to palpation in the posterior lumbar spine, no muscle spasm, a decreased range of motion, and a positive lumbar spine nerve root provocation test. (Tr. 184). Dr. Cole also reported that Plaintiff had abnormal sensation in the right L5 nerve root distribution, no pathologic reflexes, and that her manual muscle testing was normal. *Id.* Dr. Cole recommended that Plaintiff participate in a course of physical therapy. *Id.* On March 5, 2004, Dr. Cole opined that Plaintiff was not to lift over 20 pounds, push, pull, twist, or bend. (Tr. 189).

Examining psychologist Dr. Gofberg reported on June 28, 2004, that Plaintiff completed the eleventh grade and was in slow learning classes, that she had a slow gait, her social presentation was unsophisticated, and that her mood and affect were within the normal range. (Tr. 212-19). Dr. Gofberg also reported that Plaintiff displayed no evidence of psychomotor retardation or anxiety, was oriented, had normal associations, and that there was no evidence of psychosis. *Id.* Dr. Gofberg noted that Plaintiff's verbal IQ was 61, her performance IQ was 70, and her full scale IQ was 62, placing her in the upper reaches of the mild mentally retarded range of functioning. *Id.* Dr. Gofberg noted that Plaintiff had a tendency to give up easily and it was likely that her actual intellectual functioning was more within the borderline range had she been putting forth her best effort, that her memory was in the borderline range, and that her reading ability was at the 4.7 grade

7

equivalent. *Id.* Dr. Gofberg identified Plaintiff's diagnoses as borderline to mild mentally retarded intellectual functioning and he assigned her a GAF of 65. *Id.* Dr. Gofberg opined that Plaintiff's intellectual ability was within the borderline range and suggested that she would be able to perform in the simple and repetitive work task range, that her attention/concentration skills fell within the lower reaches of the borderline range and she would likely only be able to perform simple and repetitive tasks, that she appeared able to related to others and should be able to handle average people contact, and that she was preoccupied with her physical problems and that would interfere with her ability to handle a high stress position. *Id.*

Plaintiff consulted with Dr. Saleh of the Ohio Institution for Comprehensive Pain Management on March 26, 2004, and she continued to receive treatment at that facility until at least March, 2006. (Tr. 260-363). At the time Dr. Saleh first evaluated Plaintiff, he reported that she had an abnormal posture with guarding and splinting, walked with a limp favoring the left lower extremity, was able to heel and toe walk with severe discomfort, and was able to get on and off the exam table with severe discomfort. *Id.* Dr. Saleh also reported that Plaintiff had diffuse tenderness, spasm, and trigger points over the lumbar paraspinous muscles, latissimus dorsi muscles, quadratus lumborum, psoas, gluteus muscles, and piriformis muscles all on the right and left, that there was tenderness over the sacroiliac and facet joints on the right left, and that range of motion was restricted. *Id.* Dr. Saleh essentially noted that Plaintiff's neurological examination was normal, straight leg raising was positive at 50 degrees bilaterally, and that the Lasegue's, Fabere's, and piriformis syndrome tests were all positive bilaterally. *Id.* Dr. Saleh identified Plaintiff's diagnoses as lumbosacral sprain/strain and lumbar intervertebral disc displacement L3-4 and L2-3. Dr. Saleh recommended a course of treatment and opined that Plaintiff should continue temporary total

8

disability. *Id.*

On April 12, 2004, Dr. Saleh reported that Plaintiff's diagnoses were lumbosacral strain and sprain and HNP at L2-3, L3-4, that her condition was poor but stable, an MRI demonstrated post surgery at L4-5, focal disc protrusion at L3-4, degenerative disease at L4-5 with loss of disc height, and that Plaintiff had a decreased range of lumbar spine motion and positive straight leg raising bilaterally. *Id.*

Dr. Saleh reported on November 22, 2004, that Plaintiff had been a patient in his practice since May, 1999, and that based on the subjective and objective findings from testing and evaluations, she was totally disabled. *Id.* Dr. Saleh also reported that Plaintiff had chronic pain and dysfunction due to her condition and that it was permanent, that based on her age, education, and background, she was not able to return to work on a sustained basis in a competitive work environment. *Id.*

A March 14, 2005, MRI of Plaintiff's lumbar spine revealed postoperative and degenerative changes at the various levels with overall mild neural effacement. *Id.*

On June 27, 2005, Dr. Saleh reported that Plaintiff was able to sit, stand, and walk each for less than 15 minutes, alternately sit/stand/walk for less than 20 minutes, occasionally lift up to 10 pounds, and that she was not capable of performing either light or sedentary work. *Id.* Dr. Saleh also reported that it was necessary for Plaintiff to lie down for substantial periods during the day and that she would be absent from work for 5+ days a month due to her impairment. *Id.*

Dr. Saleh reported on March 15, 2006, that Plaintiff's diagnoses were lumbar intervertebral disc displacement, lumbar degenerative disc disease, and lumbosacral sprain and strain, her condition was poor but stable and deteriorating, and that she had decreased ranges of

motion, decreased sensation in her lower extremities, decreased strength endurance. *Id.* Dr. Saleh also reported that Plaintiff was able to sit for less than 10-15 minutes at a time, was able to lift/carry up to 10 pounds occasionally, and that she was unemployable. *Id.*

Examining neurosurgeon Dr. West reported on April 25, 2005, that Plaintiff had palpable tenderness in the lower lumbar region, a decreased range of motion, and that Plaintiff had difficulty standing erect from a flexed position. (Tr. 254- 55.) Dr. West also reported that Plaintiff's reflexes at the ankles were decreased at 0-1/4 bilaterally, she had weakness of the extensor hallucis longus muscle bilaterally, sensory deficits along the left lower leg when compared to the right, and that straight-leg raising test was positive on the right at 45 degrees. *Id.* Dr. West identified Plaintiff's diagnoses as a post-laminectomy syndrome and degenerative disk changes at L4-5. *Id.* Dr. West opined that Plaintiff's symptoms were caused by the degenerative disk changes at L4-5 level rather than any recurrent herniation, that an interior lumbar interbody fusion at the L4-5 level might be of some benefit, but that he could only give Plaintiff approximately a 50-50 chance of improving with the surgery. *Id.*

On June 13, 2005, examining physician Dr. Walters reported that Plaintiff walked with a stiff gait, had mild tenderness and muscle spasm in the lumbar paraspinal muscles bilaterally, a reduced range of lumbar spine motion, and that Plaintiff exhibited a mild weakness of dorsiflexion of her right foot and great toe. (Tr. 256-57). Dr. Walters also reported that Plaintiff had some decreased sensation in the right L5 distribution, her deep tendon reflexes were hypoactive at her right ankle and absent at her left ankle, and that straight-leg raising produced radicular sciatic pain at 70 degrees on the right. *Id.* Dr. Walters diagnosed Plaintiff with a chronic lumbosacral sprain and protruding discs at L2-3 and at L3-4; he recommended a 31% permanent partial impairment of the

10

whole person based on AMA guides, 5th Edition. *Id.*

Dr. Jawadi of Springfield Endocrinology, Inc., has been Plaintiff's treating physician since at least March, 1999, and Plaintiff has continued to receive treatment from Dr. Jawadi through at least October 26, 2006. (Tr. 364-95; 402-03). On November 6, 2004, Dr. Jawadi reported that Plaintiff's diagnoses were hypothyroidism and hyperlipidemia and that sometimes Plaintiff was not compliant with medication because she could not afford to buy it. *Id.*

Plaintiff continued to receive treatment from Dr. Saleh during the period March 15 to July 17, 2006. (Tr. 396-401).

Plaintiff alleges in her Statement of Errors that the Commissioner erred by rejecting Dr. Saleh's opinion and by failing to find that she satisfied Listing 12.05C.

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (alteration in original) (quoting 20 C.F.R. § 404.1502). However, a treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986). A treating physician's opinion is to be given

11

controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994).

The reason for the "treating physician rule" is clear: the treating physician has had a greater opportunity to examine and observe the patient. *See, Walker v. Secretary of Health and Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992). Further, as a result of his or her duty to cure the patient, the treating physician is generally more familiar with the patient's condition than are other physicians. *Id.* (citation omitted).

While it is true that a treating physician's opinion is to be given greater weight than that of either a one-time examining physician or a non-examining medical advisor, that is only appropriate if the treating physician supplies sufficient medical data to substantiate that opinion. *See, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983); *see also, Bogle v. Sullivan,* 998 F.2d 342 (6th Cir. 1993). A treating physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability. *Id.* Further, the Commissioner may properly reject a treating physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with the other evidence of record. *Cf., Kirk, supra; see also, Walters, supra.*

Plaintiff argues that the Commissioner erred by rejecting Dr. Saleh's opinion because it is supported by his records as well as with the other evidence of record.

In rejecting Dr. Saleh's opinion, Judge Armstead essentially noted that it was inconsistent with his clinical notes and inconsistent with other evidence of record. (Tr. 20-21; 26-

27). This Court agrees.

First, the Court notes that it appears that many of Dr. Saleh's clinical notes were apparently prepared by an "Assistant" and signed by Dr. Saleh[1]. *See, e.g.,* Tr. 264-69; 272-74; 278; 280-83; 285-91. It also appears that some of the clinical notes/reports were signed only by a physician assistant. *See, e.g.,* Tr. 308; 311; 318; 323; 401. In addition, it appears that Dr. Saleh's signature stamp was used on many of the more complete clinical notes/reports. *See, e.g.,* Tr. 270-71; 275-77; 284; 294-95; 298; 304; 396; 397. Further, it appears that many of the clinical notes bear Dr. Saleh's signature stamp and well as the physician assistant's signature stamp. *See, e.g.,* Tr. 275; 284; 295; 310; 317; 327. Finally, many of the clinical notes from Dr. Saleh's office appear to be a form clinical note and are repetitious in character. *See, e.g.,* Tr. 270; 271; 275; 277; 284; 295.

Nevertheless, assuming the accuracy of what is written or indicated in Dr. Saleh's clinical notes and assuming that those notes were indeed documented by Dr. Saleh, they are inconsistent with Dr. Saleh's opinion that Plaintiff is totally disabled. For example, while there are indications in Dr. Saleh's clinical notes of some positive objective findings such as tenderness, muscle spasms, and a limping gait, it is frequently indicated in Dr. Saleh's clinical notes that "medications are effective in controlling [Plaintiff's] pain and increasing function and quality of life.". *See, e.g.,* Tr. 270; 271; 275; 276; 284; 295; 298; 310; 317. In addition, the clinical notes from Dr. Saleh's office indicate that although on occasion she described her pain as between "discomforting" and distressing", Plaintiff frequently described her pain as only "discomforting"or even between "mild" and "discomforting". *See, e.g.,* Tr. 263; 264; 265; 266; 267; 278; 280; 281;

---

[1] In discussing this aspect of the clinical notes from Dr. Saleh's office, the Court's references to individual pages in the transcript is not to be taken as an inference that these examples are to the exclusion of other like incidents in the clinical notes.

282; 283; 398. Additionally, Dr. Saleh based his opinion that Plaintiff is disabled on factors other outside his area of expertise, specifically, her age, education, and background. *See, supra.*

Dr. Saleh's opinion is also inconsistent with other evidence of record. For example, the objective tests of record, such as MRIs, revealed only degenerative disc disease, small disc protrusions ot herniations, and mild effacement. In addition, Dr. Kaplan apparently questioned the validity of the results of Plaintiff's physical exam and opined that Plaintiff was able to return to work with no restrictions. Further, Dr. Cole reported that Plaintiff's neurological examination was essentially normal, and Dr. Moshos opined that Plaintiff was able to return to work without restrictions. Finally, Dr. Saleh's opinion is inconsistent with the reviewing physicians' opinions. (Tr. 237-42).

Under these facts, the Commissioner had an adequate basis for rejecting Dr. Saleh's opinion that Plaintiff is disabled.

Plaintiff argues next that the Commissioner erred by failing to find that she satisfied Listing 12.05C.

A claimant has the burden of proving that his or her impairments meet or equal the Listings. *Bowen v. Yuckert,* 482 U.S. 319 (1987). In order to meet the requirements of a listed impairment, the claimant must meet all of the elements of the listed impairment. *See, Hale v. Secretary of Health and Human Services,* 816 F.2d 1078, 1083 (6th Cir. 1987), *citing, King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1984) (lack of evidence indicating the existence of all the requirements of Listing 1.05C provides substantial evidence to support the Secretary's finding that claimant did not meet the Listing). It is not sufficient to come close to meeting the requirements of a Listing. *Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir. 1989) (Secretary's decision affirmed where

medical evidence almost establishes a disability under Listing 4.04(D)).

>Listing 12.05 reads in part:
>
>*Mental Retardation and Autism:* Mental retardation refers to a significantly sub average general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)....
>The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>...
>
>C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function;
>...

20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05.

The regulations provide that a claimant will meet the listing for mental retardation only "[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* one of the four sets of criteria...." *Foster v. Halter,* 279 F.3d 348 (6th Cir. 2001) (citations omitted)(emphasis in original).

In finding that Plaintiff does not satisfy Listing 12.05C, Judge Armstead essentially noted that Plaintiff has not been diagnosed as having mental retardation and there is no evidence of deficits in adaptive behavior before age 22.

As noted above, while a school psychologist reported that Plaintiff's IQ was 65, the psychologist did not identify Plaintiff with mental retardation. Indeed, the psychologist noted that while Plaintiff was "not too bright", she was well compensated in some areas. Further, the psychologist did not describe any deficits in Plaintiff's adaptive behavior.

Although examining psychologist Dr. Gofberg reported that Plaintiff's verbal IQ was 61 and her full scale IQ was 62, he questioned the validity of those scores noting that Plaintiff "had

15

a tendency to give up easily and it was likely that her actual intellectual functioning was more within the borderline range had she been putting forth her best effort." While Dr. Gofberg identified Plaintiff's Axis II diagnosis as "borderline to mild mentally retarded intellectual functioning", based on Plaintiff's tendency to give up easily, he clearly doubted the validity of a diagnosis of mild mentally retarded intellectual functioning.

Finally, the reviewing psychologists, who noted that Plaintiff engaged in relatively normal activities of daily living, had worked full-time, and appeared to function normally, determined that Plaintiff did not satisfy the Listings and is capable of performing routine, simple tasks. (Tr. 220-35).

Under these facts, the Commissioner did not err by failing to find that Plaintiff satisfies Listing 12.05C.

The issue is not, of course, whether there is evidence to support Plaintiff's allegations of disability or whether this Court would reach a different conclusion than the Commissioner reached. Rather, our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not

disabled and therefore not entitled to benefits under the Act be affirmed.

November 20, 2008.

*s/ Michael R. Merz*
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).